NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARTHA GEANEY,<br><br>                 Plaintiff,<br><br>v.<br><br>COMPUTER SCIENCES CORPORATION, ROBERT FASSETT, GEORGE BACON, and EDWARD MELLO<br><br>                 Defendants. | Civ. No. 03-2945 (WGB)<br><br>**OPINION** |

**APPEARANCES:**

Anne P. Ward, Esq.
**HOOK, SMITH & MEYER**
851 Franklin Lake Road
P.O. Box 128
Franklin Lakes, NJ 07417

     Counsel for Plaintiff

John A. Snyder, Esq.
**JACKSON LEWIS LLP**
60 Washington Street, 3rd floor
Morristown, NJ 07960

     Counsel for Defendants

**BASSLER, SENIOR DISTRICT JUDGE:**

     In 1999, Plaintiff Martha Geaney ("Plaintiff") began working as an Account Executive for Computer Sciences Corporation ("CSC"), a company that provides information technology services to private companies and the federal government.  In January 2003, after Plaintiff failed to meet certain sales goals, CSC

1

gave Plaintiff the option of participating in a performance improvement plan ("PIP") or of accepting a severance package. Plaintiff rejected both options and, on January 27, 2003, CSC terminated Plaintiff's employment.

Plaintiff thereafter sued CSC and three members of CSC's management team, Robert Fassett, George Bacon, and Edward Mello, in New Jersey Superior Court, Passaic County, alleging: (1) breach of contract; (2) sex discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"); (3) violation of a non-compete agreement; and (4) fraud. On June 19, 2003, CSC and the individual defendants removed the case to federal district court on the basis of diversity jurisdiction.[1]

The parties completed discovery in May 2004, including depositions. By Stipulation dated June 28, 2004, Plaintiff voluntarily dismissed the fraud claim and the claim relating to the non-compete agreement. Plaintiff also voluntarily dismissed the Complaint as to defendants Bacon and Mello.

The remaining defendants, CSC and Fassett (collectively, "Defendants"), now move for summary judgment on the sex discrimination and breach of contract claims. For the reasons set forth in this Opinion, Defendants' motion is granted with respect to the sex discrimination claim and denied with respect to the breach of contract claim.

---

[1]     Venue in the district of New Jersey is proper pursuant to 28 U.S.C. § 1391(a).

2

## I.   SEX DISCRIMINATION CLAIM

### A.   Background[2]

In April 1999, Plaintiff began working for CSC as an Account Executive, starting at an annual salary of $195,000 plus bonuses. (Pl. Rule 56.1 Statement ¶ 6.)  Plaintiff worked primarily out of CSC's office in West Orange, New Jersey.  (Fassett 5/12/04 Dep. at 18.)  As an Account Executive, Plaintiff was responsible for selling CSC's computer consulting services to potential clients. (Geaney 1/14/04 Dep. at 125.)

In March 2002, CSC reorganized its practice groups and Plaintiff was assigned to the Diversified Industries and Consumer Products Practice Group for the New York metropolitan area ("Diversified Group").  (Geaney 1/14/04 Dep. at 130.)  As a result of the reorganization, Robert Fassett became Plaintiff's supervisor.  (Id.)  Plaintiff claims that while she was under his supervision, Fassett discriminated against her on the basis of her sex.[3]

_____

[2]      The facts set forth in this Opinion are taken from the parties' Local Civil Rule 56.1 Statements ("Rule 56.1 Statements") and from other materials in the record, including transcripts of deposition testimony.  All facts are undisputed unless otherwise noted.  In addition, the Court notes that Plaintiff submitted a Certification in opposition to Defendants' motion for summary judgment.  To the extent that any facts set forth in the Certification are directly contradicted by Plaintiff's earlier deposition testimony, the facts in the Certification will be disregarded.  See Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991)("When, without satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists.").

[3]      Plaintiff testified at her deposition that Fassett was the only person at CSC who discriminated against her:
     Q.    Other than Bob Fassett, is there anyone else you

Initially, Plaintiff was one of three Account Executives assigned to the Diversified Group--the other two were Roger Doty and Stephen Georghakis. (Fassett 5/12/04 Dep. at 16-17; 50.) By mid-2002, both Doty and Georghakis had left the Diversified Group--Doty was transferred to another position within CSC and Georghakis was terminated after failing to successfully complete a PIP. (<u>Id.</u>) Plaintiff was then the only Account Executive assigned to the Diversified Group until August 2002, when Fassett hired four new Account Executives--Robert Newman, David Jewell, Michael Orozco, and Rick Kilcoyne. (<u>Id.</u> at 28.) During the entire period that Plaintiff was assigned to the Diversified Group she was the only female Account Executive assigned to it.

**B.    Plaintiff's Termination**

On January 9, 2003, Fassett met with Plaintiff to discuss Plaintiff's interim performance evaluation for the six-month period from April 2002 through October 2002 ("Interim Evaluation"). The Interim Evaluation showed that Plaintiff was well below targeted revenue and profit goals. (Pl. Rule 56.1

---

        believe discriminated against you because of
        your sex?
A.      No.
Q.      When did Bob--Bob Fassett become your
        supervisor?
A.      It was in the March timeframe, 2002.
Q.      So prior to March 2002, you don't believe you
        were discriminated against because of your sex.
        Is that right?
A.      Yes, right.
Q.      So, it was only after Bob became your
        supervisor?
A.      Yes.
(Geaney 5/4/04 Dep. at 16.)

Statement ¶ 95; Ward Cert., Exh. I.)  According to Defendants, because of Plaintiff's "poor sales performance," Fassett gave Plaintiff two options: she could either participate in a PIP, with no option for severance pay if she did not successfully complete the PIP, or she could accept immediate termination with severance pay.  (Pl. Rule 56.1 Statement ¶ 98; Def. Rule 56.1 Statement ¶ 19.)  Defendants contend, and Plaintiff disputes, that Fassett's conduct was consistent with CSC policy.  (<u>Id.</u> at ¶ 20.)

On January 10, 2003, Plaintiff informed Fassett that she was interested in the severance package.  (Geaney 1/14/04 Dep. at 170.)  Five days later, on January 15, Fassett e-mailed Plaintiff the details of CSC's severance offer ("Severance Agreement").  (<u>Id.</u> at 174-76.)  The Severance Agreement consisted of nine weeks salary, or $34,085.77, and imposed on Plaintiff a number of terms and conditions, including a strict covenant not to compete.  (<u>Id.</u> at 174-78.)

After consulting with an attorney, Plaintiff decided that the Severance Agreement was unacceptable.  (<u>Id.</u>)  Accordingly, on January 17, Plaintiff left Fassett a voice message stating that she was unwilling to sign the Severance Agreement, and that she was interested in negotiating a different severance package.  (<u>Id.</u> at 177.)

Plaintiff was out of the office from January 18 through January 26, 2003 because of a pre-approved vacation.  (Pl. Rule

5

56.1 Statement ¶ 106.)  On January 27, the date Plaintiff was scheduled to return to work, Fassett left Plaintiff a voice message instructing Plaintiff to come into the office immediately in order to sign a PIP.  (Geaney 1/14/04 Dep. at 182-83.) Plaintiff did not meet with Fassett on that day because of several previously scheduled business and personal appointments. (Id. at 188.)  Plaintiff was out of the office again on January 29.  This time, George Bacon, Fassett's supervisor and a CSC Managing Director, called Plaintiff at home to discuss Plaintiff's employment status.  Plaintiff repeated to Bacon that the terms of the Severance Agreement were unacceptable, and that she was unwilling to sign a PIP.  (Id. at 189-90.)

By letter dated January 29, 2003, CSC formally terminated Plaintiff's employment.  (Cahoon Aff. Exh. L.)  The letter, signed by CSC's Human Resources Manager, stated, in relevant part:

> This is to advise you that your employment with CSC Consulting, Inc. (CSC) will be terminated effective Friday, January 31, 2003, due to abandonment of your position. You advised CSC management to contact your attorney Bill Smith to discuss your employment status.
>
> Mr. Smith stated to Ward Classen, CSC's Legal Counsel, that you did not accept CSC's offer of a buy-out package, that you would not agree to be placed on a Performance Improvement Plan ("PIP") and that you would not be returning to work.  As such, you have been placed in an unapproved/unpaid status of absence without approved leave since Tuesday, January 28[th].

(<u>Id.</u>)  Plaintiff thereafter filed suit.

Plaintiff vigorously disputes Defendants' claim that she was terminated because of poor sales performance and because she refused to accept either a PIP or the Severance Agreement. Instead, Plaintiff argues that Fassett took adverse employment action against her because she is female.

### C.  Legal Analysis

In an employment discrimination case such as this one, the district court's task at the summary judgment stage is to "determine whether, upon viewing all of the facts and reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff."  <u>Hankins v. Temple Univ. Health Sci. Ctr.</u>, 829 F.2d 437, 440 (3d Cir. 1987).

In doing so, the Court must apply the now familiar <u>McDonnell Douglas-Burdine</u> burden-shifting analysis.  <u>See Texas Dept. of Comm. Affairs v. Burdine</u>, 450 U.S. 248 (1981); <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>see also Murphy v. Hous. Auth. & Urban Redev. Agency of the City of Atlantic City</u>, 32 F. Supp. 2d 753, 763 (D.N.J. 1999) (noting that the <u>McDonnell Douglas</u> framework "applies to both Title VII and NJLAD claims for employment discrimination").

First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of

7

discrimination.  <u>Burdine</u>, 450 U.S. at 253.  Second, if the plaintiff succeeds in proving the prima facie case, then the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action.  <u>Id.</u> Third, if the defendant carries its burden, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are pretextual.  <u>Id.</u>  In this case, all three elements of the <u>McDonnell Douglas-Burdine</u> test weigh in favor of granting Defendants' motion for summary judgment.

### 1.   Plaintiff's prima facie case

To establish a prima facie case of sex discrimination, Plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) she was negatively affected by the Defendants' employment decisions; and (4) she was treated less favorably than employees not within the protected class.  <u>Hankins</u>, 829 F.2d at 440; <u>Murphy</u>, 32 F. Supp. 2d at 763. As the Supreme Court has explained, "[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons" for the adverse employment action.  <u>Burdine</u>, 450 U.S. at 253-54.

Mindful that the  "plaintiff's burden of presenting a prima facie case is not intended to be an onerous one," <u>Edwards v. Schlumberger-Wells Svcs.</u>, 984 F.Supp. 264, 278 (D.N.J. 1997), the

Court nevertheless finds that Plaintiff cannot establish a prima facie case of sex discrimination because the record simply does not show that Fassett treated similarly situated male Account Executives more favorably than he treated Plaintiff.[4]

The undisputed record shows that Fassett gave at least three male Account Executives under his supervision the option of participating in a PIP or of accepting a severance package when they failed to meet sales goals: (1) Steve Georghakis in March 2002; (2) Robert Newman in December 2002; and (3) Michael Orozco in June 2003.  Each of these three Account Executives chose one of the options presented to them: (1) Georghakis accepted the PIP, failed to successfully complete it, and was consequently terminated on June 25, 2002; (2) Newman accepted the severance package in December 2002 and was thereafter terminated; and (3) Orozco was placed on a PIP, successfully completed the PIP, and remained a CSC Account Executive.  (Fassett Aff. ¶¶ 6-11.)

The fact that these three similarly situated male Account Executives received the same treatment that Plaintiff received drastically undermines Plaintiff's sex discrimination claim.  See

---

[4]     Defendants also argue that Plaintiff's prima facie case fails because Plaintiff cannot establish that she met CSC's legitimate job expectations.  The Court finds that it is more appropriate to address this issue at a later stage of the analysis.  See Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852, 867 (D.N.J. 2002) (Stating that a plaintiff's qualifications are "more appropriately addressed under Defendant's rebuttal to Plaintiff's prima facie case."); Cinelli v. U.S. Energy Partners, 77 F. Supp. 2d 566, 576 (D.N.J. 1999)(Stating that the issue of "[w]hether poor performance was the real reason behind [plaintiff's] discharge is best left to the pretext stage under McDonnell Douglas-Burdine.").

e.g. Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998) (A plaintiff cannot "completely ignore a significant group of comparators who were treated equally or less favorably than she.").

Moreover, Plaintiff's argument that three other similarly situated male Account Executives "were allowed the option of transferring to other positions within CSC when they received poor evaluations" is unsupported by the record: (1) there is no evidence that Roger Doty's transfer to an Account Manager position had anything to do with his sales performance; (2) Joseph Loehle was a Practice Director, and not an Account Executive, when he transferred to another position within CSC; and (3) Plaintiff does not point to any evidence showing that Steven Georghakis was ever given the option of transferring to another position within CSC.[5]  (Fassett 5/12/04 Dep. at 29-30; Geaney 5/4/04 Dep. at 70-73.)  Plaintiff's reliance on these three individuals is therefore misplaced.  As the Sixth Circuit Court of Appeals has explained:

> to be deemed 'similarly-situated,' the

---

[5]   The Court also considers the situation of two other Account Executives not specifically mentioned by Plaintiff in her disparate treatment argument--Rick Kilcoyne and David Jewell.  According to the record, Rick Kilcoyne was specifically placed in an Account Executive position in order to transition into a management position.  Therefore, Kilcoyne was not similarly situated to Plaintiff.  With respect to David Jewell's performance, the record is incomplete.  Nevertheless, even assuming that Jewell was treated more favorably than Plaintiff, "reliance on a single member of the non-protected class is insufficient to give rise to an inference of discrimination" when Plaintiff was treated the same as other members of the non-protected class.  See Simpson, 142 F.3d at 646.

10

> individuals with whom the plaintiff seeks to
> compare his/her treatment must have dealt
> with the same supervisor, have been subject
> to the same standards and have engaged in the
> same conduct without such differentiating or
> mitigating circumstances that would
> distinguish their conduct or the employer's
> treatment of them for it.

<u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992); <u>see</u> <u>also</u> <u>Shumway v. United Parcel Svc., Inc.</u>, 118 F.3d 60, 64 (2d Cir. 1997) ("the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects").[6]

The lack of evidence supporting Plaintiff's claim that Fassett treated similarly situated male Account Executives more favorably gives the Court ample reason to grant Defendants' motion for summary judgment.  The Court also finds, however, that even if Plaintiff could establish a prima facie case, summary judgment is appropriate because Plaintiff fails to rebut Defendants' legitimate nondiscriminatory reasons for the adverse employment action.

> ### 2.   Defendants' Legitimate Nondiscriminatory Justification for the Adverse Employment Action

Once a plaintiff has established a prima facie case of sex discrimination, the burden shifts to the defendant to rebut the

---

[6]     Moreover, Plaintiff testified that she never asked Fassett, or anyone else at CSC, for permission to transfer to another position within CSC. (Geaney 5/4/04 Dep. at 73.)

presumption by producing evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. Burdine, 450 U.S. at 255.  The defendant does not need to persuade the court that it was actually motivated by the proffered reason.  Id.; see also Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (describing the defendant's burden as "relatively light").  Rather, the defendant is simply required to "clearly set forth, through the introduction of admissible evidence, reasons for its actions, which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)(internal quotation marks and citations omitted) (emphasis in the original). Here, Defendants argue that Plaintiff was given the option of participating in a PIP or of taking a severance package because she failed to meet her revenue and profit goals for the first and second quarters of fiscal year 2003.  (Def. Br. 6.) The Court finds that Defendants' argument is amply supported by the record.

Plaintiff's Interim Evaluation for fiscal year 2003, shows that Plaintiff was well below targeted sales goals for the first and second quarters of 2003.  Specifically, a section of the evaluation entitled "Key Result Areas (KRAs) and Job Objectives Evaluation," shows that although Plaintiff's 2003 quarterly

revenue target was $1.25 million, Plaintiff generated only *$1,250*
in revenue in the first quarter of fiscal year 2003 and *zero*
dollars in revenue in the second quarter.  Likewise, although
Plaintiff's 2003 quarterly gross profit goal was $575,000,
Plaintiff generated only *$500* in gross profit in the first
quarter of fiscal year 2003 and *zero* dollars in the second
quarter.  Not surprisingly, Plaintiff was rated "below
expectations" in the area of "customer impact/value added."
(Ward Cert., Exh. I.)  Fassett states in the evaluation:

> The two major expectations of a Account
> Executive is to generate revenue for CSC by
> selling profitable services.
>
> 1. Performance on the generate revenue
> expectations Martha is performing at a 0% of
> the expectations;
>
> 2. performance on the generate gross profits
> expectations Martha is performing at a 0% of
> the expectations. [sic]

(<u>Id.</u>)  In light of this record, the Court has little difficulty
finding that Defendants meet their burden of production.

### 3.   Plaintiff's Pretext Argument

Plaintiff may defeat Defendants' motion for summary judgment
by either: (1) discrediting the proffered reasons, either
circumstantially or directly; or (2) adducing evidence that
discrimination was more likely than not a motivating or
determinative cause of the adverse employment action.  <u>Fuentes</u>,
32 F.3d at 761-62.  Here, Plaintiff fails to raise a genuine

13

issue of material fact as to either ground.

>### a)   Credibility of Defendants' proffered justification

In order to discredit the employer's proffered justification, Plaintiff cannot simply show that the employer's decision was wrong or mistaken.  <u>Id.</u> at 765.  Rather, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." <u>Id.</u> (internal quotation marks and citations omitted).  "While this standard places a difficult burden on the plaintiff, it arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." <u>Id.</u>  In this case, the Court finds that Plaintiff woefully fails to meet her burden.

First, Plaintiff states that her "job performance was always outstanding." (Pl. Rule 56.1 Statement ¶ 52.)  In support of her argument, Plaintiff points to: (1) the positive ratings and comments that she received in each of her performance evaluations; (2) the positive statements of a former CSC Practice Manager, Judith Rothrock; and (3) several documents showing that Plaintiff's earnings figures for fiscal 2001 through 2003 were

equal to or better than other Account Executives at CSC.  In
addition, Plaintiff relies on her own sworn Certification in
which she states: "I consistently exceeded objectives for
marketing campaigns, cold and warm calling, and obtaining
meetings with target clients at senior levels...I consistently
received compliments from my clients on the quality of my work."
(Geaney Cert. ¶ 42.)

     The Court agrees with Plaintiff that the record does in fact
show that Plaintiff performed extremely well in numerous aspects
of her job.  For example, in her performance evaluation for 2001,
Plaintiff received high ratings in the categories of "timeliness
of delivery," "quality of work output," "independent work
ability," and "work habits."  In addition, Plaintiff received a
number of positive comments, including:

> "Martha produces high quality proposals,
> client presentations, and work products..."
>
> "Martha is attentive to meeting reporting
> deadlines on time, and she reacts quickly to
> changes in direction from management."
>
> "Martha is adept at mobilizing teams to
> support opportunity pursuits and proposal
> efforts..."
>
> Martha is collaborative and involves others
> appropriately in the sales process."

(Cahoon Aff., Exh. C)  Unfortunately for Plaintiff, evidence of
her high performance in areas other than her ability to generate
revenue does nothing to further her argument.

As the Third Circuit Court of Appeals has explained, "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations.  See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 528 (3d Cir. 1992).  Instead, the focus at the pretext stage of the analysis "is on the particular criteria or qualifications identified by the employer as the reasons for the adverse action." Simpson, 142 F.3d at 647.  In this case, therefore, the issue is whether Plaintiff met her 2003 sales goals and not, as Plaintiff would have it, on her overall job performance or qualifications.

Although the Court is certainly sympathetic to Plaintiff's claim that "[her] inability to meet [her] objectives was caused by factors beyond [her] control," that argument is not relevant to the Court's analysis.  (See Pl. Cert. ¶ 41.)  "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765.  In other words, [c]ourts are not permitted to second-guess performance standards or to make personnel decisions for employers." Ditzel v. Univ. of Medicine & Dentistry of New Jersey, 962 F.Supp. 595, 604 (D.N.J. 1997) (internal quotation marks omitted).[7]

---

[7]     For the same reasons, the Court finds unavailing Plaintiff's argument that "the 2003 Evaluation was premised on inaccurate information." (See Pl. Br. 25.)

> **b)** **Evidence that discrimination was more likely than not a motivating or determinative factor**

To show that discrimination was more likely than not a cause of the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that gender was a motivating or determinative factor in the employment decision. <u>See</u> <u>Simpson</u>, 142 F.3d at 644-45. For example, the plaintiff may point to evidence showing that the employer: (1) previously discriminated against her; (2) discriminated against other persons within the plaintiff's protected class or within another protected class; or (3) treated more favorably similarly situated persons not within the protected class. <u>Id.</u> Here, the facts relied upon by Plaintiff are either contradicted by the record or are of dubious probative value.

### *Plaintiff's Client List*

Before Plaintiff was assigned to the Diversified Group, Plaintiff worked under the supervision of CSC Practice Manager Joseph Loehle. Loehle had assigned Plaintiff a target list of approximately 100 potential clients. After Loehle's practice group was disbanded and Plaintiff was reassigned to the Diversified Group, Fassett transferred several of the clients that were previously on Plaintiff's target list to the newly hired male Account Executives. Plaintiff argues that Fassett deliberately transferred "productive accounts" away from

17

Plaintiff and to her male counterparts.  At her deposition, however, Plaintiff admits that she did not have any concrete opportunities lined up with any of potential clients that were transferred.  (Geaney 5/4/04 Dep. at 108-10.)

### *Training*

Plaintiff states that Fassett did not allow her to attend a "Pioneer Training" class because "she could not attend every day of the training." (Pl. Br. 32.)  Instead, Fassett instructed Plaintiff to attend another, allegedly inferior, training class. (Id. 33.)  Plaintiff argues that Fassett treated three male Account Executives more favorably because, in comparison to Plaintiff, Fassett "insisted that [male Account Executives] attend the training despite their schedules." (Pl. Br. at 32-33.)

### *CSC's Business Culture*

Plaintiff claims that Fassett excluded her from CSC's "business culture" by assigning her a larger number of "cold calls" than male Account Executives.  (Id. at 34.)  Plaintiff concedes, however, that various people were responsible for assigning her cold calls.  (Geaney 5/4/04 Dep. at 96-99.)

Plaintiff also claims that she was not permitted to interview new Account Executives even though at least one male Account Executive, David Jewell, helped to interview Michael Orozco and Robert Newman for Account Executive positions. Plaintiff's claim is, however, flatly contradicted by her

18

deposition testimony in which she states that she is "aware of the fact that Mike Orozco and Bob Newman had already accepted offers from CSC before David Jewell began his employment." (Geaney 5/4/04 Dep. at 63.)

Plaintiff also claims that Fassett failed to attend sales meetings with Plaintiff's potential clients, despite the fact that he attended similar meetings set up by male Account Executives.  (Pl. Br. 34-35.)  There is no evidence in the record to support or refute Plaintiff's allegation.

### *Tuition Benefits*

Plaintiff argues that she was denied tuition reimbursement benefits whereas at least three CSC Account Executives, two male and one female, received such reimbursements.  (Geaney 5/4/04 Dep. at 11-16.)  Plaintiff admits that, unlike Plaintiff, two of the Account Executives who received tuition reimbursement had submitted application forms to CSC in accordance with the procedures set forth in the Employee Handbook.

### *Disparaging Comments*

Plaintiff claims that on one occasion Fassett publicly humiliated her by "gesturing she had body odor and sniffing under his arms."  (Pl. Rule 56.1 Statement ¶ 93.)

The Court concludes that none of the facts set forth above, whether viewed individually or as a whole, raises an inference of discrimination.  Compare e.g. Cinelli v. U.S. Energy Partners, 77

F. Supp. 2d 566, 578 (D.N.J. 1999) (finding a genuine issue of material fact where employer's justification for termination was poor sales performance and plaintiff's sales figures increased during the relevant time period).  Plaintiff's conclusory allegations of discrimination are simply insufficient to rebut Defendants' legitimate nondiscriminatory reasons for the adverse employment action.  See e.g. Billet v. Cigna Corp., 940 F.2d 812, 816 (3d Cir. 1991) ("Merely reciting that age was the reason for the decision does not make it so.").  Consequently, summary judgment in favor of Defendants is appropriate.

## II.  BREACH OF CONTRACT CLAIM

CSC maintains an "Educational Assistance Program" ("Tuition Reimbursement Program") through which employees are reimbursed for eligible tuition expenses.  The details of the Tuition Reimbursement Program are set forth in CSC's Employee Handbook ("Handbook").

The Handbook provides that: "[a]ll regular and full-time employees employed with CSC on the date the course begins and ends are eligible for educational assistance benefits."  (Ward. Cert., Exh. E.)  The Handbook explains:

> Tuition and certain registration and
> laboratory fees are reimbursed in full upon
> successful completion of a course sponsored
> by an accredited college/university...The
> course need not be directly related to your
> present job or function.  However, the
> completion of the course should, in the
> opinion of your supervisor, significantly

> enhance your present or future job
> performance at CSC.

(Id.) The Handbook further states: "[a]pproval must be obtained prior to registration.  Application forms are available from your Human Resources representative." (Id.)

It is undisputed by the parties that CSC employees are typically required to submit an online application form to Human Resources prior to enrollment in a course for which they seek reimbursement.  It is also undisputed that Plaintiff did not submit a written application for tuition reimbursement until after Plaintiff had either already completed or commenced the courses for which she sought reimbursement.  What is disputed is whether Defendants made an unconditional oral promise to Plaintiff to reimburse her for tuition expenses, regardless of whether Plaintiff followed the procedures set forth in the Handbook.[8]

### A.   Defendants Alleged Oral Promise of Tuition Reimbursement

Around the time that Plaintiff interviewed with CSC for the Account Executive position, Plaintiff began a doctoral program in business and technology.  Plaintiff claims that in order to

---

[8]    Under New Jersey law, "[o]ral promises, representations, employee manuals, or the conduct of the parties, depending on the surrounding circumstances, have been held to give rise to an enforceable obligation on the part of an employer.  Troy v. Rutgers, 168 N.J. 354, 365, 774 A.2d 476 (2001); see also Shebar v. Sanyo Business Sys. Corp., 111 N.J. 276, 288, 544 A.2d 377 (1988) (recognizing the enforceability of an employer's oral promise that the employee would only be terminated for cause).

"induce" her to repudiate her prior acceptance of a competing job offer, James Labick and Judith Rothrock, the two members of CSC's management who interviewed Plaintiff for the Account Executive position, "promised that CSC would pay for her doctoral program." (Pl. Rule 56.1 Statement ¶ 12.)  Plaintiff claims that neither Labick nor Rothrock "ever told [her] that there were limitations or prerequisites to their promise."  (Id. at ¶ 14.)

In support of her claim, Plaintiff points to her own deposition testimony and to the Certification filed by Judith Rothrock.  The following excerpts of Plaintiff's deposition testimony are illustrative:

> Q.    When Mr. Labick told you that tuition
>       reimbursement was part of the benefits,
>       did you discuss tuition reimbursement in
>       any further detail?
> A.    No, no.  Other than, you know, that I
>       would have support for tuition
>       reimbursement because it was a benefit
>       provided to employees.
> Q.    At the interview, did you ask him how
>       tuition reimbursement worked at CSC?
> A.    No.
> (Geaney 1/14/04 Dep. at 46-47.)
>
> A.    ...I had attended seminars in which CSC
>       paid for some of the travel to those
>       seminars.  I had written a paper that
>       was selected for presentation at an
>       international telecommunications union
>       in Switzerland.  CSC, we put CSC's
>       letterhead on that paper.  So I went as
>       representative of the company, and there
>       was a paper that I had written as part
>       of my program, my doctoral program.  So
>       it was openly discussed.  Everyone knew
>       that I was going to get the tuition
>       reimbursement.

22

(<u>Id.</u> at 61-62).

Q.    Let's start at your first interview.
      What did you discuss with Ms. Rothrock
      regarding tuition reimbursement?
A.    We discussed that I was just beginning a
      doctoral program, that [wherever] I was
      going to go and work...I was interested
      in tuition reimbursement.  I was told
      that... tuition reimbursement would be
      made available to me, that it was one of
      the employees' benefits to people who
      worked in the company.
Q.    Ms. Rothrock told you that?
A.    Yes.
Q.    Did you ask her any detailed questions
      about the procedure of receiving. . .
A.    No, no.
(<u>Id.</u> at 63-64.)

Q.    You testified that you did not [follow
      the procedures in the Employee
      Handbook], is that correct?
A.    I had already received a verbal
      commitment from Jim Labick and from
      Judith Rothrock that there was approval
      for the course that I was taking and for
      my program.  So, no, I didn't do that,
      but I did approach them, and they had
      approved it.
(<u>Id.</u> at 70.)


In addition, Rothrock states in her Certification:

      ...[Jim Labick and I] promised [Plaintiff]
      tuition expenses would be reimbursed by CSC.
      ...I did not mention the actual procedures
      involved in the tuition reimbursement policy,
      or mention that there were caps on the amount
      that could be reimbursed each year.
      (Id. ¶ 8.)...I had no idea there were any
      caps or limitations on, or prerequisites to
      our promise.  I do not know now, nor did I
      ever know, of any policy specifics, as set
      forth in CSC's handbook(s), that would have
      been impediments to reimbursing Martha the
      whole amount of her tuition as we had

23

promised her on behalf of the company.

(Rothrock Cert. ¶¶ 8-9.)

In Defendants' view, Plaintiff's deposition testimony is not only inadequate to support the conclusion that Defendants made Plaintiff an unconditional promise to reimburse her for tuition benefits, but it also constitutes a "judicial admission" that Plaintiff knew that in order to obtain reimbursement she had to submit a written application in accordance with the Handbook. (Def. Reply Br. 4-5.)  For example, Defendants point to the following exchange between Plaintiff and defense counsel:

> Q.   When Mr. Labick told you that tuition reimbursement is a benefit which CSC provides, did you think that you were just going to automatically get tuition reimbursement, without following company policy?
>
> A.   No, I never thought that I would not follow company policy.
>
> Q.   So in Exhibit 3 when it states that you should submit a completed tuition reimbursement request form...why did you think that you didn't have to do that?
>
> A.   I'm not saying that I didn't think I had to do that.  When I interviewed, I made it clear that I was in a graduate program.  The people that I interviewed with told me that I would get tuition reimbursement...they never told me that I had to complete a form first.  They never told me that.

(Geaney 1/14/04 Dep. at 71-72.)  Plaintiff's testimony may very well be characterized as contradictory, if not purposefully evasive.  That does not mean, however, that it constitutes an unambiguous admission by Plaintiff that she knew that she had to

submit a written application for tuition reimbursement or forfeit her right reimbursement.

Rather, noting that "[t]he legitimacy of the representations and the reasonableness of the employee's reliance are questions for the finder of fact that are not appropriate for summary judgment" Labus v. Navistar Int'l Transp. Corp., 740 F.Supp. 1053, 1063 (D.N.J. 1990), the Court finds that the evidence contained in the record raises an issue of material fact as to whether Defendants made an unconditional promise to Plaintiff to reimburse her for her doctoral program.  Accordingly, summary judgment in favor of Defendants on the breach of contract claim is denied.

## III. CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion for summary judgment is granted with respect to Plaintiff's sex discrimination claim and is denied with respect to Plaintiff's breach of contract claim.  An appropriate Order follows.


WILLIAM G. BASSLER

William G. Bassler, U.S.S.D.J.


DATED: June 3, 2005